IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JUDITH GAYLE TEGLER,

                    Plaintiff,

        v.

GLOBAL SPECTRUM and COMCAST-
SPECTACOR,

                    Defendants.

HONORABLE JEROME B. SIMANDLE

Civil No. 15-1730 (JBS/AMD)

**OPINION**

APPEARANCES:

Michelle J. Douglass, Esq.
MY RIGHTS LAWYERS EMPLOYMENT LAW GROUP, LLC
424 Bethel Road
Somers Point, NJ 08244
        Attorney for Plaintiff

Jonathan David Ash, Esq.
Wayne E. Pinkstone, Esq.
Eileen Powers, Esq.
FOX ROTHSCHILD LLP
997 Lenox Drive, Building 3
Lawrenceville, NJ
-and-
Nathan Michael Buchter, Esq.
FOX ROTHSCHILD LLP
1301 Atlantic Avenue, Midtown Building
Suite 400
Atlantic City, NJ 08401
        Attorneys for Defendants

**SIMANDLE, District Judge:**

## I. INTRODUCTION

        This is a case originally brought in the Superior Court of

New Jersey by Plaintiff Judith Gayle Tegler against her former

employer, Defendant Global Spectrum, L.P. ("Global Spectrum"),

and its parent corporation, Comcast-Spectacor. The case was removed to this Court on March 9, 2015 by Defendants. [Docket Item 1.] Plaintiff alleged that her termination by Global Spectrum in 2014 violated the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19.1 et seq. ("CEPA"), the age discrimination prohibition of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("NJLAD"), and the prohibition against retaliation under the Family Medical Leave Act, 29 U.S.C. § 2617 ("FMLA"). [Docket Item 1-1 at 21-24.]

Pending before the Court is Defendants' Motion for Summary Judgment [Docket Item 46].

For the reasons set forth below, the Court will grant in part and deny in part Defendants' Motion for Summary Judgment.

## II. BACKGROUND[1]

---

[1] For purposes of the instant motion and pursuant to Local Civil Rule 56.1, the Court looks to Plaintiffs' Complaint [Docket Item 1-1] when appropriate, Defendants' Statement of Undisputed Material Facts [Docket Item 46-1], Plaintiff's Response to Statement of Material Facts [Docket Item 49-1], Defendants' Comparison of Statement of Material Facts and Response to the Statement [Docket Item 54-1], and related exhibits and documents.
The Court notes with disapproval Plaintiffs' counsel's noncompliance with the dictates of Local Civil Rule 56.1(a), which requires the "opponent of summary judgment" to "furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and

## A. Procedural Background

On or about January 26, 2015, Plaintiff filed a complaint in the Superior Court of New Jersey, Law Division, Atlantic County against four parties: Global Spectrum, Comcast-Spectacor, Comcast Corporation (the parent corporation of Global Spectrum and Comcast-Spectacor), and the Casino Reinvestment Authority ("CRDA"). [Docket Item 1-1 at 4.] Plaintiff alleged that she had been wrongfully terminated from her position as Human Resource Management by Global Spectrum in violation of CEPA, NJLAD, and FMLA. [Id. at 21-24.] Plaintiff alleged both age discrimination under NJLAD and FMLA retaliation, but the bulk of her complaint centered on the claim that she had been wrongfully terminated after attempting to blow the whistle on allegedly wrongful and/or discriminatory or harassing workplace behavior by a Global Spectrum employee named Ryan Stouffer, as well as Global

---

other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment." (Emphasis added.)

While Plaintiff's counsel disputed many of the proposed Undisputed Material Facts, counsel did not cite to affidavits or other evidence in the record to support many of those disputations. Instead, the Court is left to sift through the truly voluminous evidentiary record to locate which evidence Plaintiff apparently relies on in her opposition to the Motion for Summary Judgment, or else "deem[ those statements] undisputed for purposes of the summary judgment" due to Plaintiff's counsel's failure to furnish a properly responsive statement of material facts. L. R. Civ. P. 56.1(a). It is not this Court's duty to do the job an attorney neglected to do.

Spectrum supervisors' failure to adequately investigate or address the same. [Id. at 7-9.]

Defendants removed the case to federal court on March 9, 2015, pursuant to 28 U.S.C. §§ 1441(a) on the grounds that Plaintiff's FMLA claim alleged a cause of action arising under a federal statute, and the Court could exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiff's CEPA and NJLAD claims. [Docket Item 1 at 2.]

Subsequently, Comcast Corporation and CRDA were dismissed with prejudice on February 26, 2016 after Plaintiff filed a Stipulation of Dismissal. [Docket Item 24.] The remaining Defendants filed the instant motion for summary judgment [Docket Item 46]; Plaintiff filed a Response in Opposition [Docket Item 49]; and Defendants filed a Reply [Docket Item 54].

**B. Factual Background[2]**

Plaintiff was hired by Global Spectrum, a wholly owned subsidiary of Comcast-Spectacor, in December of 2013. Global Spectrum terminated her employment in December of 2014, when Tegler was 61 years old.

Before her employment with Global Spectrum, Plaintiff held a variety of operational, training, and human resources

---

[2] Where not otherwise noted, the facts in this section are undisputed by the parties.

positions with Harrah's Entertainment from 1980 through 2007. In 2007, her position at Harrah's corporate human resources department was eliminated and she was laid off.

SMG is a venue management company that managed the Atlantic City Convention Center and Boardwalk Hall from 2000 to 2013. SMG is not affiliated with Global Spectrum or Comcast-Spectacor.

In November of 2007, SMG hired Plaintiff as a Human Resources Manager for the Atlantic City Convention Center and Boardwalk Hall. As a part of that position, she investigated complaints and ensured compliance with state and federal laws, among other duties.

In June of 2012, while employed by SMG, Plaintiff participated in an investigation of Ryan Stouffer ("Stouffer"), a fellow SMG employee, which involved an allegation by another SMG employee, John Sarkos (the "Sarkos Incident"). This incident involved Stouffer and his supervisor at the time, altering a large poster of a woman in a bikini, hugging a man, by placing Sarkos's face over the woman's face and then placing the poster in Sarkos's office. [Docket Item 46-1 at 47.] According to Plaintiff, the incident also involved photographing the poster and sending the picture via text message to other employees. [Docket Item 49-1 ¶ 47.] As a result of the Sarkos Incident, SMG Corporate Human Resources Manager Charlotte Jones made the

determination to issue a "final warning" to Stouffer with the
implication that any further issues would lead to Stouffer's
termination; Plaintiff was responsible for preparing the final
warning, giving it to Stouffer and discussing it with him. [Id.
at ¶¶ 48, 47.]

Plaintiff alleges that, while at SMG, she received and
investigated a number of other complaints about Stouffer from
other SMG employees, including complaints from the union shop
steward, Jeanette Bundy ("Bundy") that "Stouffer had engaged in
race motivated conduct, harassment that involved sexually
motivated behavior and inappropriate conduct." [Docket Items 49-
1 ¶¶ 47, 49; 46-4 at 64.]

Plaintiff also testified about an incident where Stouffer
made a comment about a woman (possibly a female colleague)
"wearing a really tight low cut top and something about
cleavage." [Docket Item 49-1 ¶¶ 60-61.] Stouffer was also the
subject of complaints from two other women who stated that
Stouffer teased them about their appearance and related conduct,
including complaints made by an SMG employee (later employed by
Global Spectrum as well) named Heather Monacelli. [Id. ¶ 62.]
The complaints made by Monacelli extended through her and
Stouffer's employment by Global Spectrum. [Id.] Tegler testified
that Stouffer "would tease [Monacelli] about her appearance

often and a couple of times she came to [Tegler] and said, you know, 'It's offensive. Please ask him to stop.'" She also testified that in March of 2014, Monacelli complained to her that "'[H]e's always doing this and he--I don't like the way he watches--I don't like him walking behind me because of the way he looks at me and watches me walk.'" [Docket Item 46-4 at 85.]

Plaintiff also testified that Bundy made complaints to her about Stouffer's conduct that involved "violations of various union contract provisions such as scheduling, seniority, [and] pay[.]" [Docket Item 49-1 ¶ 57.] Bundy also complained to Plaintiff regarding Stouffer and race. [Id. ¶ 57; Docket Item 49-2 at 20.] While Plaintiff did not come to the specific conclusion that Stouffer had made any comments regarding the race of an employee while at SMG, Plaintiff discussed the situation that led to Bundy's complaint with Stouffer and reminded him of SMG's policies; per Plaintiff, Stouffer denied the conduct and "he would promise that he wouldn't do it again." [Docket Item 49-2 at 20.]

In September of 2013, while still employed at SMG, Plaintiff was investigated for allegedly sharing Stouffer's confidential medical information with Stouffer's direct supervisor. [Docket Item 46-1 ¶ 53.] Plaintiff denies sharing such information and states that she was never disciplined while

employed at SMG. [Docket Item 49-1 ¶¶ 53, 54.]

Plaintiff has stated that in November or early December of 2013, Stouffer was involved in an incident where he allegedly "lost his temper and screamed and swore at" Maggie Santos, the SMG Director of Events. [Docket Item 46-1 ¶ 63.] Plaintiff states that she told Global Spectrum's Corporate Human Resources Manager, Nicole Orlosky, about this incident; in response, Orlosky told Plaintiff that Global Spectrum would not elevate Stouffer from acting Public Safety Manager to permanent Public Safety Manager. However, Orlosky left Global Spectrum shortly thereafter. [Docket Item 49-1 ¶ 63.]

At approximately the same time (November of 2013), Plaintiff learned that the management contract for the Atlantic City Convention Center and Boardwalk Hall had been awarded to Global Spectrum. She applied for a human resources position with Global Spectrum at the Convention Center and Boardwalk Hall, and was hired as a Human Resources Manager on December 16, 2013. Plaintiff claims that Global Spectrum did not make clear to whom she was to report, or what her job duties would be, and that in the absence of such direction she continued to perform the same duties that she had at SMG. [Docket Item 49-1 ¶ 33.]

On January 1, 2014, Global Spectrum assumed management of the Atlantic City Convention Center and Boardwalk Hall.

Defendants claim that all SMG employees hired by Global Spectrum were given "a new blank slate regarding 'attendance records and previous documentation or issues of performance.'" [Docket Item 46-1 ¶ 44.] Plaintiff disputes this, stating that this was true "in some senses" and "in most cases." [Docket Items 49-1 ¶ 44; 49-2 at 24.]

On December 23, 2013, Plaintiff signed an acknowledgement that she had received the Global Spectrum Personnel Policy Manual and that she had read it, understood it and become familiar with all of its policies. [Docket Item 46-1 ¶ 34.] Plaintiff claims that she signed this at the request of Orlosky but had not in fact received the Policy Manual when she did so. [Docket Item 49-2 at 28-29.] Tegler also signed a form acknowledging that her employment was at will. [Docket Item 46-1 ¶ 35.]

The Policy Manual included a "Respect in the Workplace Policy," which explicitly prohibits harassment, discrimination, and retaliation in any form, whether verbal, physical, or environmental, that is based upon sex, gender, race, age, disability, religion, ethnicity, sexual preference or any other individual or group characteristic protected by law. [Docket Item 46-5 at 15-24.]

The Respect in the Workplace Policy also provides:

[Comcast-Spectacor/Global Spectrum] will not tolerate
illegal retaliation against any employee who, in good
faith, reports potential discrimination, harassment
and/or retaliation or participates in an investigation
of such a report. . . .

Retaliation against an individual who reports a claim
or who participates in an investigation of a claim is
unlawful. [Comcast-Spectacor/Global Spectrum]
prohibits all forms of unlawful retaliation related to
workplace discrimination, including, opposition to a
practice believed to be unlawful discrimination or
harassment, which is based on a reasonable, good faith
belief, or, participation in an employment
discrimination proceeding, such as an internal
investigation.

Unlawful retaliation may occur when an employee
suffers an adverse employment action (e.g., demotion,
salary reduction, or termination) because he or she
engaged in protected conduct.

[Id. at 16, 20.] The Policy also contains a "Complaint Procedure

for Reporting a Violation of the Policy," which instructs all

employees to report "all incidents which may constitute

discrimination, harassment or retaliation" promptly to one of

"the designated contacts" identified in the Policy. [Id. at 20.]

The Policy also states that "[i]n addition to the above

designated contacts, [Global Spectrum] employees may report any

concerns to the following individuals in their facilities:

Facility Human Resources Representative; Facility General

Manager; Facility Regional Vice President[.]" [Id. at 21.] The

Policy also states that "[i]ndividuals with supervisory

responsibility are required to report such conduct or behavior

immediately, regardless of how they learned of it" and that
"[a]ny individual with supervisory responsibility will be
subject to disciplinary action if he or she does not immediately
report conduct or behavior that may violate this Policy." [Id.
at 20, 23 (emphasis added).]

After the Respect in the Workplace Policy, the Policy
Manual outlines Defendants' "Open Door Policy," the purpose of
which was to create "an environment that fosters open,
constructive communications" and was meant to "encourage
[employees] to discuss . . . ideas, issues, or complaints with .
. . supervisor[s] without fear of retaliation." [Id. at 26.] The
Open Door Policy called for employees to, first, discuss any
issues with their immediate supervisors, where "the problem
should be put in writing at that time." Second, employees who
felt that the problem was not resolved or who did not feel
comfortable discussing the issue with their supervisors "should
request a meeting with the next level of management or a
representative of the Human Resources Department." Third, the
employee who felt that "a satisfactory resolution of the problem
still ha[d] not been reached" was directed to write to the Vice
President of Human Resources and/or the CEO "requesting a final
decision." [Id.] The Open Door Policy also states: "Concerns
about unlawful discrimination, retaliation or harassment,

especially sexual harassment, should be pursued through the company's 'Respect in the Workplace' policy and reporting procedures." [Id.]

In December of 2013, Plaintiff attended a meeting where SMG employees were introduced to Global Spectrum management. In a discussion after the meeting, Plaintiff alleges, she was asked for insights into any employees with current performance issues, and, at that time, voiced her concerns about Stouffer, stating that his "inappropriate" behavior while employed by SMG had culminated in his being on "final warning" status. [Docket Item 49-1 ¶ 67; 46-4 at 65-66.]

Plaintiff alleges that she discussed the Sarkos Incident, as well as other incidents regarding Stouffer, with Fran Rodowicz ("Rodowicz") and Karen Totaro ("Totaro"). Rodowicz is Global Spectrum's general manager for the Convention Center and Boardwalk Hall; Totaro is the former general manager of the Convention Center and reported to Rodowicz. Plaintiff states that Totaro said she considered the incidents "frivolous," that no action was necessary, and that "they" (Rodowicz and Totaro) had confidence in Stouffer and wanted to develop him. [Docket Item 49-1 ¶ 69.]

In January or February of 2014, Plaintiff met with Rodowicz and two members of Global Spectrum's corporate finance

department. Stouffer's role was discussed, and Plaintiff expressed her concern that Stouffer represented an "increasing liability risk because of his inability to control his anger and behavioral issues that were the subject of employee complaints." Plaintiff acknowledges that none of those complaints related to harassment or discrimination. [Docket Item 49-1 ¶¶ 136-140.]

In February of 2014, Rodowicz and Jim McDonald, the Director of Operations/Assistant Manager at the Convention Center, held a manager staff meeting, which Plaintiff attended. At that meeting, Rodowicz and McDonald "made a point to bring up that they believed [Plaintiff's] office . . . should not be complaint central and that . . . it was alarming how many employees came in . . . to complain to [Plaintiff] about issues and that they wanted managers to handle issues and they wanted employees to go and follow the chain of command and that issues needed to be addressed by the managers." [Docket Item 49-2 at 36.]

Rodowicz also expressed that he did not want Plaintiff's office to be "complaint central" at a meeting with Tegler and Totaro in the spring of 2014 that Tegler requested to clarify her job duties. [Docket Item 46-4 at 74.] In the context of this meeting, Tegler assured Rodowicz that while employees "were accustomed to being able to come and talk over issues with [her]

13

or make complaints to [her] if they didn't feel they were resolved by their department manager or supervisor, . . . [she nevertheless] always encouraged them to go to their supervisors first or their manager first and that most often they had already tried that route before they came to see me. . . . [She] never wanted to do or had done things in isolation . . . [and she] was a business partner." Id. at 75.

At some point prior to the spring of 2014, but after the January or February meeting where Tegler expressed to Rodowicz that she felt Stouffer was a "liability risk" but did not specifically cite complaints of discrimination or harassment, a co-employee named Ernest Ward complained to Bundy (who informed Tegler) that Stouffer had used the phrase "You people and your constant complaints," or "You people need to start doing your jobs right," which Ward (who is African-American) took to be both race-based (the "you people" phrasing) and age-based, as well as derogatory. [Docket Item 46-4 at 78.] Tegler then confirmed this incident with Ward. Id. at 78-79. At her deposition, Tegler testified that a majority of the Public Safety employees were African-American and "the perception of those African-American employees was that Ryan was a--did not treat them fairly and that he treated them . . . with discrimination or discriminated against them." Id. at 79. Tegler

14

also testified that she believed she was able to corroborate Ward's account with a co-employee who witnessed the exchange, and that she believed Stouffer admitted to using the words "you people." Id. While Tegler investigated this incident, she ultimately referred the matter to Jim McDonald (the assistant general manager/director of operations) and did not recommend a specific disciplinary course of action, because "it became increasingly clear during this period that if . . . and when [she] brought complaints to Jim [McDonald] regarding Ryan, that he was to handle them, he was to conclude them and that [she] should not be as involved as [she] may have previously been involved [at] SMG in recommending disciplinary measures or other consequences." Id. at 80.

In February, another employee, Gary Wright, "made a complaint or two" regarding "harassment" by Stouffer, which "had to do with the way Ryan spoke to him, with the words Ryan used, the fact that Ryan yelled and the fact that he used profane language." Id. at 81. While Tegler believes she spoke with Stouffer about that allegation, she testified that it would have been in conjunction with McDonald because she understood by that time that Rodowicz and McDonald wanted her to refrain from directly engaging with Stouffer on any issue of substance in their absence. Id. at 81.

Tegler testified at her deposition that Stouffer would frequently make age-related comments to her along the lines of "Well, you wouldn't know anything about that, it's after your time," or suggesting that Tegler wouldn't or couldn't understand things because "you would have to be on Facebook or . . . Twitter." Id. at 83-84. She characterized him as "constantly . . . making inappropriate jokes and comments about physical appearance, age, dating." Id. at 84. Tegler also testified that when she would ask about something relating to technology, e.g., getting a DVD burned from a surveillance recording, Stouffer "would say, 'You don't understand. You wouldn't understand. I'll take care of it[,']" and that she believed those comments to be because "either . . . I'm a woman or because of my age": "Well, why wouldn't I understand?" Id.

In the spring of 2014, Rodowicz told Plaintiff that Stouffer would become the Public Safety Manager and that an assistant manager position would be created. Rodowicz and Totaro expressed confidence in Stouffer despite his youth and inexperience, and said they believed he had potential. They told Plaintiff that she "needed to have more confidence in them that they knew what they were doing."

In late March and early April of 2014, Plaintiff attended a series of meetings with Rodowicz and Totaro. At least one of

those meetings occurred on the same day wherein Plaintiff was informed that Stouffer would become the permanent Public Safety Manager. It was in that meeting that Plaintiff expressed the following concerns, as she characterized them in her deposition testimony: "I raised concerns that there was potential for harassment if employees were so inclined to make formal complaints that some of Ryan's behavior would be problematic, that it may or may not actually be harassment but it could be perceived [that way] and that employees were definitely coming to me and using that word. Whether or not it was actual harassment, I couldn't determine because I was told not to investigate." [Docket Item 49-2 at 47.] Plaintiff states that she "specifically addressed the issue that . . . it was [her] duty to protect the company from any exposure, from possible illegal activity with regard to employment law." [Docket Item 46-4 at 108.]

She also stated that at that meeting, Stouffer's making of inappropriate age-related comments to Tegler "was one of the things that I talked about, you know, that he would make those comments[.]" Id. at 84. She also believes that this meeting occurred only a week after Monacelli complained to her about Stouffer's conduct, and that "it was very soon after that that . . . the meeting happened with [Totaro and Rodowicz], but I

believe that I also said something [about Monacelli's complaints] to [McDonald.]" Id. at 85.

Plaintiff also reported "the wedgie incident" (an incident involving Stouffer ostentatiously again moving his pants out of his backside in response to a complaint by Monacelli about her seeing him do this and Stouffer saying "Like this?") at this meeting. Right after that incident, Monacelli and another employee, Catherine Emmell, came to Tegler's office and said, "Ryan does this kind of thing all the time" and complained about him yelling and swearing on the phone loudly. Id. at 87. Tegler testified that when she talked to Totaro, she "said, 'This is, you know, the complaints that I got about this. I mean, I believe that I handled it at that moment, addressed it but, you know, I'm not sure how to proceed.' And she said, 'Employees just need to have a better sense of humor' and I think 'not be so petty' or something to that . . . effect, that you know, 'just take this in stride somehow. They need to stop making complaints about it.'" Id. at 88.[3]

At this meeting, Tegler testified, Rodowicz told Tegler, "Do not entertain any more complaints." Id. at 86.

In mid- to late spring of 2014, Bundy reported to Tegler an

---

[3] A note that may have been regarding this incident appears in the record and indicates that the date of the conversation with Totaro was May 2, 2014. [Docket Item 49-3 at 224-25.]

incident wherein Stouffer used one white employee for special
assignments (e.g. helping Stouffer with scheduling) despite that
employee being part-time and having less tenure with the company
and less familiarity "with the department and scheduling
practices," while "there were others that were just as qualified
that were African American. And [Bundy] specifically stated that
she thought it was discriminatory." Id. at 102. Tegler confirmed
the facts with Stouffer and then reported the situation to
McDonald. Id. at 103. Tegler also testified that, at this time,
Stouffer "was having difficulty balancing the schedule" and that
"there was a lot of dissatisfaction within the department about
assignments": there was a sense that "certain people were
getting choice shifts or ability work overtime shifts, and that
they weren't following the protocol for awarding overtime
shifts. And that it was based on who Ryan liked and didn't like.
. . . Plus he was making mistakes with pay every week that was
creating a lot of dissatisfaction. And people perceived that
some of this was targeted at certain people, rather than being a
simple mistake with no malice involved." Id. Tegler testified
that when she relayed her concerns over the situation to
McDonald, she stated that management needed to make sure "that
there was no chance that it could be perceived as
discriminatory. We needed to address the issue and find out if

it was. And if it was, then we needed to do something about it."
Id.

Another employee, Jessica, reported to Tegler (while all were still employed by SMG) that Stouffer made "inappropriate comments about how she was dressed." Id. at 85. Jessica continued to informally report to Tegler that similar comments continued, but Tegler was unsure whether this took place before or after Global Spectrum took over the management of the facilities. Id. at 86. In June of 2014, however, employees took a bus to a Philadelphia Phillies game, and Tegler learned that Stouffer "had been drinking heavily and made some inappropriate comments to Jessica in the bus . . . you know, about like whos he was dating and, you know, what kind of men she preferred and that kind of thing, and she was sitting in a seat right in front of him and, you know, he was kind of just not leaving her alone." Id. Jessica nevertheless asked Tegler not to intervene formally as a result of any of these incidents and would not be specific about what Stouffer said to her on the bus. Id. at 85-86. Plaintiff testified that she told Karen Caiola about this incident in October of 2014. Id. at 95.

Plaintiff alleges that in mid- to late summer of 2014, Stouffer told her directly that "he did not want to hire

any[]more black people." [Docket Item 49-2 at 49-50.][4] Plaintiff states that she responded: "I said, 'Ryan, you can't say that. You can't--that's not appropriate. Do not say that. If somebody is qualified, we have to consider them seriously for the role and you can't hire anybody less qualified who's not African[-]American.'" Id. at 50. Plaintiff stated that she "was concerned that Ryan was not [applying the same criteria to every applicant] and he was being subjective and that we, you know, might be exposing the company to some kind of unfair hiring practice situation" and told Stouffer as much. Id. Plaintiff testified that she also told McDonald that she had concerns about how Stouffer was conducting the interview process. Id. Plaintiff testified that she "believed" she reported this comment of Stouffer's, among others,

> to Karen Caiola when she came and visited the property some time in late August or early September.
>
> Q. You say you believe. You're not sure or--
>
> A. I was fairly open with Karen about all of my concerns, which would have at that time included concerns that we had, you know, potential harassment, possibly sexual harassment and race discrimination complaints that might arise out of Ryan's behavior and some of which hadn't, I think, been appropriate addressed and I believe that I said that to her. Again, I can't be absolutely sure. I don't know why I would have left it out.

---

[4] A possible reference to this conversation also appears in the record in the form of a note taken by Tegler. [Docket Item 49-3 at 219.]

Id. at 50-51. Tegler acknowledged that "it could be accurate" that out of nine people hired as Public Safety employees during Stouffer's tenure, seven were African-American. Id. at 51.

At a meeting in June of 2014, Rodowicz, Totaro and/or McDonald had a management meeting wherein they said "that they wanted it to be communicated to employees that they should follow the chain of command and not come to [Tegler's] office first"; however, Plaintiff denies that this meeting was called "to ask [her] to be more positive in the workplace" or ever asked her to "stop inserting" herself into interdepartmental issues. [Docket Item 46-4 at 112.]

In July or August of 2014, Stouffer was a passenger in a car driven by the assistant Public Safety manager, who backed the car into another car in the garage. When Tegler learned of the accident, she went to Totaro "to say 'This is the normal protocol for somebody to go and have a drug or alcohol test when they have an accident on property. Did you want this to happen or not?' And [Totaro] said, 'No, I'll follow up. I'll handle the situation.'" Id. at 87. Tegler understood this response to imply that she was correct in her understanding that Rodowicz and Totaro did not want her to conduct any investigations regarding Stouffer. Id.

Tegler testified that throughout the summer and fall of

2014, people continued to complain to her about Stouffer (notably Bundy) and that Tegler "had been warned to not entertain them, [she] would most often ask if they had spoken to Ryan, have they addressed it with Ryan directly, have they addressed it with the shop steward or if it was the shop steward had she talked to the business manager, had she talked to Ryan and then I would refer them to Jim McDonald or Fran." Id. at 95-96. Tegler stated that "it was around this time that Michael Ciallella [the business agent for Guards & Security Local 1412] informed [her] that he had been informed that they would not listen to any[ ]more complaints from the Public Safety Department." Id. at 96.

Tegler testified that a Public Safety employee named Winsome Dixon complained about unfairness in Stouffer's scheduling "with regard to the possible punishing of people for making complaints prior . . . that might be retaliation for bringing things forward and making complaints to Ryan. . . . That she wasn't being scheduled as much because she, you know, had made complaints about the way he talked to her, and that kind of thing." Id. at 115.

Karen Caiola initiated a visit in October of 2014 to Atlantic City to visit the property to "see what the operation was like here . . . [to] just generally visit and get to know

what was going on, how it all worked." At that visit, Tegler testified as follows:

> I discussed with [Caiola] that I was concerned about several issues at the property, in particular that I didn't understand what my role was or hadn't been clearly defined for me, I didn't have an approved job description, that there were incidents there that I felt weren't being properly investigated or followed up on or addressed, including potential race discrimination, sexual harassment and harassment, that I was told not to involve myself, that I wasn't permitted to be involved other than at a very low level and very initial level in any of that, therefore I felt that the property was at risk and the company was at risk. . . . I'm not sure how specific [the examples I gave] got. She didn't ask me for specific situations.

Id. at 97. Tegler testified that she wasn't asking Caiola to do anything specific except as to the clarification of Tegler's job duties: "I just wanted her to be aware of it but I wasn't asking her specifically to follow up[.]" Id. She testified that this conversation was approximately 45 minutes to one hour long. Id. Tegler also testified that she "believe[s]" that she mentioned Ryan Stouffer's name to Caiola during this conversation. Id. at 97-98.

On or around December 5, 2014, Tegler came to Rodowicz's office with a completed self-review for her performance appraisal review, but Rodowicz "turned to [her] and said, Gayle, we're going to let you go. And I said why? And they said, it's just not a good fit, you know that." Id. at 113.

Tegler testified that she believed her termination was in retaliation for her conversation with Caiola in October of 2014[5] because

> I have no other reason for my termination. I did not do anything wrong. I didn't violate any policies. I continued to do my job to the best of my ability. I was very positive about Global Spectrum coming in, and completely supported them as a company and as a management team for as long as I could, until I became extremely concerned about the fact that they didn't seem to be taking my concerns seriously about the way that the public safety department was being run and exposure to the company.
> And that I tried my best to work with management. And that they . . .did not appropriately address my concerns or the concerns of other employees at the property.
> And that I was very concerned that we were in violation of federal and state law, as well as company policies and procedures . . . [in n]ot properly addressing harassment complaints, not conducting an investigation.

Id. at 115. She elaborated: "It was soon after that [conversation] that my employment was terminated, and . . . I never heard back from Karen Caiola with an appropriate response from her. She said she would look into things, she never got back to me. So I think that means that a decision had probably

---

[5] While the record reflects different possible dates for this conversation ranging from August to October of 2014, the Court will assume that this conversation took place on October 15, 2014 as this is the date that would be closest in time to Tegler's termination. Plaintiff, as the party opposing summary judgment, is entitled to the most favorable view of the available evidence. Here, the shorter the interval between her protected activity and her termination, the stronger is the inference of a causal connection.

been made not to appropriately investigate my allegations. . . .
So my conclusion was that the company decided that it was easier
to get rid of me than to work with me, or to in any way take
seriously what was going on on the property, at least not with
me involved." Id. at 117.

Tegler testified that she believes Rodowicz (as well as
Totaro) violated "laws governing anti-discrimination and anti-
harassment and anti-violence" by not allowing "an in-depth
investigation by an impartial party in the organization to be
conducted . . . with respect to any claim of discrimination or
harassment." Id. at 116. She also testified that McDonald "was
aware of specific claims or complaints of employees about, at a
minimum, inappropriate behavior by Stouffer . . . [including]
inappropriate gestures . . . [and] behaviors. And complaints
from employees about treating them in a discriminatory manner.
And he did not, again, allow me to investigate and take
appropriate action, if it was necessary, or at least document
that there had been an investigation on it." Id. at 116. She
testified that she mentioned all of this to Karen Caiola. Id. at
116-17.

When asked if she had described "each and every complaint"
about discrimination and/or harassment of which she was aware,
Plaintiff answered: "I've told you about every complaint that I

recall at this time. Unfortunately, time has gone by, as well as me not having access to any of my documents from Global Spectrum, or any of the e-mails that I sent or received, other than ones that you've specifically pulled out. . . . I cannot say that I have remembered all of them." Id.

Tegler also expressed her belief that her age "was a definite factor" in her termination: "Partially [that] has to do with . . . comments . . . by Ryan specifically that I referenced before, about me being not with it, or up on certain in-jokes that have to do with . . . current cultural things, music, YouTube videos . . . . [H]e'd say [in response to my reprimands], . . . that's just HR, you're old school, or something like that. And that there was a culture [wherein] Fran, Ryan, Kara Shermansky, Jim McDonald . . . would regularly go out drinking after events or after work, and you know, had created some kind of a bond. And that others were not included, including myself, in these." Id. at 117.

Lynda Molodovitch (a Human Resources representative at Global Spectrum who was supervised by Plaintiff) testified at her deposition that she believed Rodowicz and McDonald were ignoring complaints about Stouffer because "we [Molodovitch and Tegler] were told that we were not to listen to the employees and that any employee complaints were to go directly to them

27

[management]. And when the employee complaints would go directly to them, the employees would come back and tell us. When they would ocme back to us saying we're not getting--that nothing is being done, we would say, 'I'm sorry, you have to go to them because that's the protocol. It has to go through them.' They would say that nothing was being done, they were being ignored." Id. at 126. Molodovitch also testified as follows:

> Q: Are you aware of any complaints of racial harassment, again at Global Spectrum as to Ryan Stouffer?
>
> A: I don't know if I characterize it as racial harassment. There were complaints that he was rude, nasty, whatever to people of color in there. Whether they felt -- it seemed that Ernest Ward felt that when he came in. . . .

Id. at 127. She also testified that Bundy would come in with complaints from herself or other employees saying that they felt that it [Stouffer's negative conduct] was racially motivated . . . that was the sense that they got from his conversations. That's the way they viewed it. . . . [Bundy expressed that she thought she was] treated differently or spoken to differently or whatever [by Stouffer] and she attributed it to race." Id. at 128.

Defendants allege that, prior to her termination, Rodowicz, Totaro, and McDonald "met with Tegler to counsel her to work on her positive energy and to instruct her to follow the chain of

command set forth in the Open Door Policy and for Tegler to refer non-pressing interdepartmental issues back to the department manager. . . . Over time, however, management did not see an improvement in these aspects of Tegler's performance. . . . As a result, Rodowicz, McDonald and Totaro made the decision to separate Tegler's employment." [Docket Item 46-1 ¶¶ 219-21 (internal citations omitted).]

Rodowicz testified that he, Totaro, and McDonald collectively made the decision to terminate Plaintiff's employment in or around December of 2014, although no contemporaneous documents record their reasoning. [Docket Item 46-4 at 137.] He was asked whether Tegler was "on a performance plan or noticed improvement [sic] before she was terminated," and responded "Yes." Further questioning established that the "performance plan" did not have a specific title; rather, the fact that Totaro and Rodowicz had met with Plaintiff "on a few occasions to talk about her job performance" was "documented" "internally." Id. He testified that at these meetings, they discussed "her demeanor and her job functions." Id. at 138. Rodowicz was not aware of any document that constituted Tegler's performance review, Tegler's performance plan, or that stated the reason for her termination before she was terminated. Id. at 138-39. Rodowicz stated that part of the conversation he had

with Tegler about her job functions regarded his preference that any issues relating to management of employees go through those managers or supervisors; nevertheless, "any union employees . . . had their business agent that they could always go to. They could go to human resources for that, any issues like that, but most of the management questions and complaints . . . we requested that they be handled by the manager or the supervisor; but it was always an open door for anybody, whether it's me, the general manager, the assistant general manager, Karen Totaro, the human resources manager. Complaints could be brought to anybody, and that's what we're there for, is to help employees to resolve any issues that they may have." Id. He reiterated: "We never prohibited any complaints from going to HR." Id.

Rodowicz testified that Tegler met with Caiola on October 15, 2014, but that Caiola never discussed her meeting with Tegler with Rodowicz, nor gave Rodowicz a copy of her notes of that meeting. Id. at 143. Rodowicz stated, however, that Caiola did "in a meeting afterwards . . . share some information about concerns [that Tegler had] . . . mostly about Ryan Stouffer . . . and I don't recall any other specific concerns. . . . [T]o the best of my recollection, myself and Karen Totaro [and McDonald] had a meeting with Karen Caiola in Philadelphia" after October 15, 2014 and before December 5, 2014. Id. at 143-44. Rodowicz

testified:

> Q: And you don't have a recollection of whether
> anybody recorded that meeting?
>
> A: No.
>
> Q: And what was the topic of discussion other tha[n]
> Ryan Stouffer and concerns that Gayle Tegler had
> regarding Ryan Stouffer?
>
> A: I think it was just -- I believe it was a meeting
> about Gayle Tegler, and I don't recall the exact other
> specifics of the meeting. Maybe about our
> correspondence with human resource[s]. I don't recall
> the specifics of the meeting.
>
> Q: Okay. How did that meeting get arranged?
>
> A: To the best of my knowledge, I think we set it up
> with Karen after her visit with the properties after
> that October 15th date.
>
> Q: Because of Gayle's concern?
>
> A: I don't recall specifically what -- or why we went
> over to Philadelphia. I don't recall the exact
> specific[s].
> . . .
> I don't recall the specifics of the meeting. I know we
> talked about Gayle Tegler, about her performance,
> about her -- her job, and then also I believe Ryan
> Stouffer was brought up as well in that meeting.

Id. at 144.

After Tegler was terminated, Defendants hired Christine

Schrader as the HR manager. Id. at 133. Christine Schrader was

46 years old when she was hired into that position in January of

2015. [Docket Item 49-2 at 109.]

Caiola's notes of the October 15, 2014 meeting suggest that

Plaintiff raised her concerns about Stouffer to her, including mentioning the Sarkos Incident, and stating that Totaro had been informed and responded that employees shouldn't complain about petty things. [Docket Item 49-4 at 203-04.] Caiola's notes appear to be fragmentary in places and include the note: "Ryan issue going to ignite." Id. at 206. They also state: "No one goes to HR for complaints. '[Employees] don't feel they can come in here to complain.'" Id. at 207.

The evidentiary record also includes a document entitled "Performance Discussion Record," dated April 13, 2015, detailing a "final warning" given to Stouffer for insubordination, by Global Spectrum. Id. at 210.

## III. STANDARD OF REVIEW[6]

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that

---

[6] The Court exercises federal question and supplemental jurisdiction over this action pursuant to 28 U.S.C. §§ 1441(a) and 1367(a).

there is a genuine issue for trial. <u>Anderson v. Liberty Lobby,</u>
<u>Inc.</u>, 477 U.S. 242, 250 (1986). In reviewing a motion for
summary judgment, the court is required to examine the evidence
in light most favorable to the non-moving party, and resolve all
reasonable inferences in that party's favor. <u>Hunt v. Cromartie</u>,
526 U.S. 541, 552 (1999); <u>Wishkin v. Potter</u>, 476 F.3d 180, 184
(3d Cir. 2007). Credibility determinations are not appropriate
for the court to make at the summary judgment stage. <u>Davis v.</u>
<u>Portlines Transportes Maritime Internacional</u>, 16 F.3d 532, 536
n.3 (3d Cir. 1994).

A factual dispute is material when it "might affect the
outcome of the suit under the governing law," and genuine when
"the evidence is such that a reasonable jury could return a
verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. The
non-moving party "'need not match, item for item, each piece of
evidence proffered by the movant,'" but must simply present more
than a "mere scintilla" of evidence on which a jury could
reasonably find for the non-moving party. <u>Boyle v. Cnty. of</u>
<u>Allegheny Pennsylvania</u>, 139 F.3d 386, 393 (3d Cir. 1998)
(quoting <u>Anderson</u>, 477 U.S. at 252).


**IV. ANALYSIS**

    **A. CEPA (Count I)**

## 1. CEPA overview

Plaintiff first count claims that her termination in December 2014 violated the Conscientious Employee Protection Act, N.J.S.A. 34:19.1 <u>et seq.</u> ("CEPA"). The Act dictates that

> [a]n employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . .
>
> . . . or
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law[.]
>
> N.J.S.A. § 34.19.3.

In order to establish a violation of this anti-retaliation provision of CEPA, a plaintiff must establish the elements of a prima facie case, namely "that (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a 'whistle-blowing' activity described in N.J.S.A. 34:19-3c; (3) an adverse employment action was taken against him or her; and (4) a causal

connection exists between the whistle-blowing activity and the adverse employment action." Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003). "[T]he court decides, as a matter of law, whether or not a plaintiff has carried his or her burden of demonstrating the elements of the prima facie case and that those elements are not part of the proofs at trial for re-consideration by the jury." Tartaglia v. UBS PaineWebber Inc., 197 N.J. 81, 125 (2008).

"In determining whether a CEPA plaintiff has offered sufficient evidence to prove his claim, courts apply the McDonnell Douglas [Corp. v. Green, 411 U.S. 792 (1973)] burden shifting test" when the claim depends on circumstantial evidence." Walsh v. Bril-Jil Enterprises, Inc., No. 15-0872, 2016 WL6246764, *11 (D.N.J. Oct. 24, 2016)(citing Bocobo v. Radiology Consultants of South Jersey, P.A., 477 Fed. App'x 890, 900 (3d Cir. 2012). After the plaintiff has made the requisite showing of the elements of the prima facie case,

> the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action. If the employer advances such a reason, the burden shift backs to the plaintiff to demonstrate that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action. Although the burden of production of evidence shifts back and forth, the plaintiff has the ultimate burden of persuasion at all times.

Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 193 (3d

Cir. 2015)(internal citations omitted).

## 2. Prima facie case

### a. Reasonable belief that a law was violated

As to the first element of the prima facie case, "[a]lthough CEPA does not require that [a] plaintiff set forth facts that, if true, would constitute a violation of [the law or public policy identified], it does require a close relationship between [his or] her claims and that [law or policy]." Dzwonar, 177 N.J. at 467. "A plaintiff who brings a claim pursuant to N.J.S.A. 34:19-3c need not show that his or her employer or another employee actually violated the law or a clear mandate of public policy. Instead, the plaintiff simply must show that he or she 'reasonably believes' that to be the case." Id. (internal citations omitted). While "the trial court must identify a statute, regulation, rule, or public policy that closely relates to the complained-of conduct," the plaintiff need not "allege facts that, if true, actually would violate that statute, rule, or public policy." Id. at 463.

"In other words, when a defendant requests that the trial court determine as a matter of law that a plaintiff's belief was not objectively reasonable, the trial court must make a threshold determination that there is a substantial nexus between the complained-of conduct and a law or public policy

identified by the court or the plaintiff. If the trial court so finds, the jury then must determine whether the plaintiff actually held such a belief and, if so, whether that belief was objectively reasonable." Dzwonar, 177 N.J. at 464. See also Fischer v. G4S Secure Solutions USA, Inc., 614 Fed. App'x 87, 92 (3d Cir. 2015) ("To survive a summary judgment motion, a plaintiff bringing a CEPA claim must establish a prima facie case by demonstrating that (1) he reasonably believed that his employer's conduct was violating a law or rule or regulation promulgated pursuant to law, (2) he objected to the conduct, (3) an adverse employment action was taken against him, and (4) a causal connection exists between the whistleblowing activity and the adverse employment action") (internal citations omitted).

Here, Defendants make just such an argument: that Plaintiff did not possess an objectively reasonable belief that a law had been violated, either by Stouffer or by Defendants. [Docket Item 46-2 at 13-22.] Defendants ask the Court to make this conclusion as a matter of law. The Court declines to do so.

Again, the Court reads the relevant precedent to require it to determine, as a matter of law, assuming the Plaintiff's factual allegations to be true, whether Plaintiff has identified violations of a statute, rule, or public policy and to assess whether a substantial nexus between the conduct and the law

exists. Courts have held that the nexus does not exist in cases where plaintiffs complained of violations of union bylaws, Dzwonar, 177 N.J. at 469; violations of "union rules or company policy," Fischer, 614 Fed. App'x at 92; or violations of a nursing code of ethics, an employee handbook, and/or a patient statement of rights, Hitesman v. Bridgeway, Inc., 218 N.J. 8, 24-41 (2014). See also Ortiz v. Penske Truck Leasing, 2016 WL 4751805, *11-*12 (Sup. Ct. N.J. App. Div. Sept. 13, 2016)(distinguishing Gerard v. Camden Cty. Health Servs. Ctr., 348 N.J. Super. 516 (App. Div. 2002), where plaintiff could have established that retaliating against employee for refusing to file unfounded disciplinary charges against different employee "cannot be in the interest of patient care or public health," from instant case, where "plaintiff could not explain how paper PMs threatened public safety" or otherwise "violated a law, regulation, or clear mandate of public policy concerning public safety" but rather merely "highlighted bad internal management"). However, in this case, Plaintiff has identified, and the Court agrees, that the nexus does exist.

The law that Plaintiff claims she reasonably believed was violated is the New Jersey Law Against Discrimination ("NJLAD"), which prohibits, inter alia, sexual harassment, gender discrimination, racial discrimination, and retaliation for

complaining of any of the above, in employment. The Court finds, accepting the evidence of Stouffer's misconduct as true, that the evidence would support a finding that Plaintiff was reporting conduct that would be a violation of NJLAD. This is so because Stouffer's conduct (and/or the failure by Defendants to adequately address and remediate the same) violated the NJLAD in the sense of committing sexual harassment which created or contributed to a hostile work environment, "when an employer or fellow employees harass an employee because of his or her sex to the point at which the working environment becomes hostile." Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 601 (1993). The evidentiary record allows for a similar conclusion, the Court finds, with regard to whether Stouffer's conduct, if assumed to be true, constituted racial discrimination in violation of NJLAD.

In general, to state a claim for hostile work environment sexual harassment under NJLAD, a party must establish that the conduct in question "1) would not have occurred but for the employee's gender; and it was 2) was severe or pervasive enough to make a 3) reasonable [person of that gender] believe that 4) the conditions of employment [we]re altered and the working environment [was] hostile or abusive." Herman v. Coastal Corp., 348 N.J. Super. 1, 20 (App. Div. 2002) (citing Lehmann, 132 N.J.

at 603-04). "[T]he same standard applies to other types of hostile work environment discrimination claims, such as those involving racial discrimination or . . . ancestry." Heitzman v. Monmouth Cty., 321 N.J. Super. 133, 144 (App. Div. 1999)(citing Taylor v. Metzger, 152 N.J. 490, 498 (1998)).

Similarly, to state a claim for racial discrimination or gender discrimination, i.e., disparate treatment, in employment under NJLAD, the plaintiff must satisfy the dictates of "the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)[.]" Viscik v. Fowler Equipment Co., 173 N.J. 1, 13-14 (2002).

> Under that framework, a plaintiff must first prove a prima facie case of discrimination. To do so, a plaintiff must show that he or she (1) belongs to a protected class; (2) applied for or held a position for which he or she was objectively qualified; (3) was not hired or was terminated from that position; and that (4) the employer sought to, or did fill the position with a similarly-qualified person. The establishment of a prima facie case gives rise to a presumption of discrimination.
>
> Once that threshold has been met, the burden of going forward shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. After the employer does so, the burden shifts back to the plaintiff to show that the employer's proffered reason was merely a pretext for discrimination. To prove pretext, however, a plaintiff must do more than simply show that the employer's reason was false; he or she must also demonstrate that the employer was motivated by discriminatory intent.

Id. at 14 (internal citations omitted).

Accordingly, the Court finds at the threshold that there is a substantial nexus between the complained-of conduct consisting of Stouffer's sexual harassment and racial discrimination (as well as Defendants' refusal to address the complaints of Stouffer's sexual harassment and racial discrimination) and the NJLAD, which would prohibit such misconduct if true.

Once the Court has found that Plaintiff identified a law, statute, or public policy that would be violated if her reported concerns were true and that a substantial nexus between the law and the reported conduct exists from which a belief in such violation could reasonably be found, it is for the jury to determine whether Plaintiff has demonstrated that she actually held such a belief and, if so, whether that belief was objectively reasonable. Dzwonar, 177 N.J. at 464. In the context of a summary judgment motion where the Court has made the objective predicate finding of a nexus between the misconduct reported by Plaintiff and the violation of a given law, rule, or public policy, it then becomes necessary to determine whether there are material facts in dispute regarding the remaining elements of the CEPA claim, namely whether the Plaintiff actually held such a belief and whether that belief was objectively reasonable. These circumstances would give rise to the possibility that Plaintiff reasonably believed she was

reporting NJLAD violations.

It bears mentioning, however, that Plaintiff does not directly bring a claim for sexual harassment, gender discrimination, or racial discrimination under NJLAD based on Stouffer's conduct or the failure of Global Spectrum's management to remediate the same. Nor need she do so in order to establish her claim under CEPA. Instead, her burden is significantly lighter; she must only show, to survive this motion for summary judgment, that the evidentiary record would provide a reasonable finder of fact with sufficient evidence to allow for a conclusion that Tegler <u>reasonably believed</u> the conduct she complained of (be it Stouffer's actions or Defendants' failure to adequately address them, <u>see infra</u>) violated a law: specifically, NJLAD. Whether or not Stouffer actually committed sexual harassment or unlawful racial discrimination is, at the risk of being redundant, not at issue here. The issue is whether, on this evidence, a reasonable observer of his behavior and the behavior of Global Spectrum could have believed that he or they violated NJLAD. <u>Cf.</u> <u>Roa v. Roa</u>, 200 N.J. 555, 562 & 565 (2010)(NJLAD claim under provision prohibiting retaliation against person who "has opposed any practices or acts forbidden under [NJLAD]" allowed to proceed, where underlying complained-of conduct was "romantic[]

involve[ment]" of supervisor "with two female subordinates," which court also characterized as "sexual harassment of the two women"). The Court holds that such a reasonable observer could have concluded that to be so.

Notably, it is not only Stouffer's own conduct that Plaintiff could reasonably have believed to violate NJLAD, but also the conduct of Defendants Global Spectrum, through Rodowicz and Totaro, not only in retaining Stouffer but also elevating him from acting Public Safety Manager to permanent Public Safety Manager, despite the reports from Tegler of complaints about his racial and sexual harassing and discriminatory behavior. "An employer's liability for sexual harassment is predicated on the harassing employee's supervisory status and his consequential status as the employer's agent . . . or if supervisors knew or should have known of the harassment campaign and allowed it to continue." Herman, 348 N.J. Super. at 25 (citing Lehmann, 132 N.J. at 618-19, and Heitzman, 321 N.J. Super. at 146. See also Payton v. New Jersey Turnpike Auth., 148 N.J. 524, 537 (1997) (employer's remedial response to complaints of harassment is relevant to employee's discrimination claim); Blakey v. Continental Airlines, Inc., 164 N.J. 38, 59 (2000)("[A]n informed employer who takes no effective measures to stop [a pattern of harassment] sends the harassed employee the message

that the harassment is acceptable and that the management supports the harasser")(internal citations omitted); <u>Burlington Indus. v. Ellerth</u>, 524 U.S. 742, 759 (1998)("An employer is negligent with respect to sexual harassment [under Title VII of the Civil Rights Act] if it knew or should have known about the conduct and failed to stop it").

The existence of several incidents involving Stouffer and complaints of sexual harassment or incidents connoting sexual harassment, as well as gender-based harassment,[7] racial preferences in scheduling, and racial discrimination in hiring, taken in the aggregate, would allow a reasonable person in Tegler's position to believe that Stouffer, Global Spectrum's management team, or both violated NJLAD; no indication was given to Tegler that Stouffer had been disciplined or otherwise discouraged from continuing this conduct, and his elevation to permanent Public Safety Director despite these complaints would have allowed a reasonable person to conclude that Defendants failed to stop the problematic conduct (e.g., the alleged harassment) by Stouffer, if not outright condoned it. <u>See Herman</u>, 348 N.J. Super. at 25-26.

Similarly, the Court finds that the evidence allows a

---

[7] <u>Cf.</u>, <u>e.g.</u>, the Sarkos Incident with <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 77 (1998).

reasonable finder of fact to conclude that Tegler could

reasonably have believed that Stouffer had violated NJLAD by

treating African-American employees differently than white

employees, given the complaints to that effect by Bundy, coupled

with Tegler's own experience of Stouffer having expressed that

he did not wish to hire any more African-Americans.[8]

Notably, Defendants argue that, once the incidents that

occurred prior to 2014 are removed from consideration, "we are

_____

[8] Defendants argue that any incidents involving Stouffer prior to
January 1, 2014 are "irrelevant" to Tegler's CEPA claim because
they predate Defendants' involvement with Tegler, Stouffer, the
Convention Center, and Boardwalk Hall, and they "cannot be held
responsible for the conduct of an individual who [they] did not
maintain an employment relationship with." [Docket Item 46-2 at
14.] The Court understands this argument, but nevertheless finds
that the conduct of Stouffer could be relevant to a
determination about whether his conduct after January 1, 2014,
while he was employed by Defendants, could have constituted a
pervasive pattern of harassment and discrimination in violation
of NJLAD, or whether Stouffer was retaliating against those who
had previously complained about his conduct--retaliation which
would itself violate NJLAD. Indeed, Bundy raised concerns
involving this issue--that Stouffer's scheduling of employees
implicated concerns about retaliation and discrimination--and
Tegler testified that she was concerned about these issues.
While Defendants could not be held responsible directly for,
e.g., the Sarkos Incident were Sarkos himself to sue Global
Spectrum over that incident, it may nevertheless be <u>relevant</u> to
this action and to the question of whether Tegler could
reasonably have believed that Stouffer's conduct in 2014 was
violating NJLAD's prohibition of pervasive gender- and race-
based harassment and retaliation in the workplace. The Court
need not decide, at this time, whether Defendants' knowledge of
Stouffer's pre-2014 workplace behavior is relevant, since ample
evidence in the record concerning the period of Global
Spectrum's employment of Stouffer exist as discussed herein.

left with eleven 'complaints' that Tegler purports to be in violation of the laws governing anti-discrimination, anti-harassment or anti-violence in the workplace[.]" [Docket Item 46-2 at 14.] Taking the evidence in the light most favorable to Plaintiff, eleven strikes the Court as a rather large number of complaints. Eleven incidents of harassment or discrimination could certainly support a case for pervasive harassment or discrimination in the workplace. See Cutler v. Dorn, 196 N.J. 419, 432 (2008)("In most cases it is the cumulative impact of separate successive incidents that cements the hostile work environment").

Furthermore, the Court does not find persuasive many of the more specific arguments as to each incident Defendants raise, e.g., that Tegler's belief in an incident's illegality was tentative, or that Tegler's testimony about Stouffer stating that he did not want to hire any more African-Americans is self-serving and ought to be disregarded, or that no "formal grievances were filed against Stouffer with Global Spectrum or the local unions on site at the Convention Center and Boardwalk Hall." [Docket Item 46-2 at 17.] The Court does not see the need to further address these highly detailed, fact-specific arguments, however; the evidentiary record, including as it does what even Defendants concede are eleven separate incidents that

(when taken in the light most favorable to Plaintiff) connote (or even describe) unlawful discrimination or harassment in violation of NJLAD, does not support the grant of summary judgment to Defendants on this point.

The thrust of Defendants' argument is that Tegler simply disagreed with Defendants' management practices and policies and the bulk of her "allegations . . . are all challenges to internal policies and decision-making, which cannot form the basis of a CEPA claim. See Hitesman, 430 N.J. Super. 198, 212 (App. Div. 2013) . . . ('CEPA affords no protection for the employee who simply disagrees with lawful policies, procedures or priorities of the employer.')." [Docket Item 46-2 at 19.] But when the Court assesses the evidence in the light most favorable to Plaintiff, Plaintiff did not disagree with lawful policies, procedures or priorities of Defendants--she disagreed with unlawful ones, namely, several complaints of harassing and discriminatory behavior (in violation of NJLAD), and the related decisions by managers, apparently, not to remediate the situation. Cf. Maimone v. City of Atlantic City, 188 N.J. 221, 235 (2006)(plaintiff's complaint was "not simply that defendants decided to assign a 'lower degree of priority' to investigations of [certain types of violations], but rather that they made a policy decision to terminate all enforcement of these criminal

laws" as contemplated by N.J.S.A. 34:19-3c).

Reasonable finders of fact may agree with Defendants that Plaintiff simply objected to lawful, internal procedures or incidents unrelated to discrimination or harassment. But reasonable finders of fact may not agree with this proposition. In any event, this is hardly the case contemplated by the New Jersey Supreme Court, describing situations where a plaintiff would lack a reasonable belief that unlawful conduct occurred for CEPA purposes:

> The issue is not whether in fact other employees were engaged in the activity complained of or whether the activity met the legal definition of fraud. Instead, the question is whether the complaining employee had a reasonable belief that the activity was fraudulent and complained about it for that reason. . . .

> At the same time, as we have cautioned, the court must be alert to the sufficiency of the factual evidence and to whether the acts complained of could support the finding that the complaining employee's belief was a reasonable one. That is, the statute does not protect employees whose complaints are directed to minor or trivial matters. As we have explained: 'if an employee were to complain about a co-employee who takes an extended lunch break or makes a personal telephone call to a spouse or friend, we would be hard pressed to conclude that the complaining employee could have 'reasonably believed' that such minor infractions represented unlawful conduct as contemplated by CEPA. . . .' [Estate of ]Roach [v. TRW, Inc.], 164 N.J. [598,] 613-14 [(2000)].

Battaglia v. United Parcel Service, Inc., 214 N.J. 518, 557-58 (2013). A reasonable finder of fact would be justified in concluding that the complaints about Stouffer's allegedly

48

harassing and discriminatory behavior were not similar in kind to complaints about a co-worker's long lunches.

Similarly, Defendants mistakenly cite Hitesman, 218 N.J. at 35, for the proposition that "[v]ague and conclusory complaints . . . are not the sort of things that the Legislature intended to be protected by CEPA." [Docket Item 46-2 at 15.] This quotation appears in Battaglia, which discusses guiding principles in assessing CEPA claims of the "causal link between the complaint by the employee and the retaliatory action of the employer," and notes that factfinders may "draw an inference from all of the circumstances relating to the decision"; "evaluate the response of the employee's supervisor to the complaint" to determine whether the employer was complicit or ratified the alleged employee conduct; or "find that an employee had demonstrated the requisite causal link indirectly[,]" for instance when a supervisor who prepares a biased evaluation in response to an employee's complaint, thereby "sufficiently taint[ing] the view of the actual decision maker to support relief." 214 N.J. at 558-59. Battaglia then continues:

> These guiding principles demonstrate that it is
> critical to identify the evidence that an aggrieved
> employee believes will support the CEPA recovery with
> care and precision. Vague and conclusory complaints,
> complaints about trivial or minor matters, or
> generalized workplace unhappiness are not the sort of
> things that the Legislature intended to be protected
> by CEPA.

Id. at 559. The Battaglia court ruled that the plaintiff's complaints (including an anonymous letter that "leveled a wide variety of allegations" but "made no reference to any conduct that related, even remotely, to credit cards or business lunches," as well as a single oral complaint "about employees in another division" regarding either "improprieties on the credit card usage or about employees who were going out for liquid lunches and abusing the UPS credit card") were not reasonably taken as implicating fraud but rather were simple complaints about "other employees who were drinking at lunch or taking long lunch breaks[.]" Such complaints do "not rise to the level of activity protected under CEPA": "[W]e do not suggest that, even if proven, a complaint about a minor violation of a company's internal policy on the use of company credit cards would be cognizable." Id. at 560-61 (citing Roach, 164 N.J. at 613-14).

Hitesman also does not support the proposition that summary judgment should be granted to Defendants. In Hitesman, the plaintiff premised his CEPA claim on his complaints about "improper quality of patient care" under N.J.S.A. 34:19-3(a)(1), -3(c)(1), and -3(c)(3). 218 N.J. at 14. The court ruled that the "improper quality of patient care" provision of CEPA "must be premised upon a reasonable belief that the employer has violated a law, rule, regulation, declaratory ruling adopted pursuant to

law; or a professional code of ethics that governs the employer and differentiated between acceptable and unacceptable conduct in the employer's delivery of patient care"; however, in the circumstances presented, the American Nursing Association's Code of Ethics "provided no standard for his employer's control of infectious disease" and could not serve as a premise for a CEPA claim. Id. at 15-16. Furthermore, the employee handbook and "Statement of Resident Rights" "neither defined acceptable patient care nor stated a clear mandate of public policy" upon which the plaintiff could premise a CEPA claim. Id. at 16. As contemplated by Dzwonar, Hitesman involved a plaintiff who could not adequately identify the law or public policy at issue that he or she reasonably believed the employer to be violating or show a nexus between that law or policy and the complained-of conduct. This is not that case.

A reasonable juror could conclude that Tegler's stated fears that NJLAD had been violated or was being violated were reasonable fears to have under these circumstances. "The object of CEPA is not to make lawyers out of conscientious employees but rather to prevent retaliation against those employees who object to employer conduct that they reasonably believe to be unlawful[.]" Mehlman v. Mobil Oil Corp., 153 N.J. 163, 193-94 (1998). Defendants' motion for summary judgment will therefore

be denied as to those grounds.

## b. Whistle-blowing activity

Defendants next argue that the evidence does not allow the Court to conclude that Plaintiff engaged in any protected activity under CEPA. The Court does not agree.

Defendants argue that "Tegler's complaints to Caiola during the October 2014 meeting do not constitute protected activity under CEPA. At her deposition, Tegler could not recall with any specificity what she discussed with Caiola" and that Caiola's notes of the meeting "are void of any reference to complaints of discrimination or harassment related to Stouffer while he was employed by Global Spectrum." [Docket Item 46-2 at 23.] "At best, those notes reflect [Tegler's] belief that Stouffer was not qualified as a supervisor; her complaints about Stouffer related to him yelling and/or talking down to employees; the Sarkos Incident, which occurred while Stouffer was employed by SMG; the hiring of Menz; and the workers' compensation issue. . . . That 'belief,' however, does not provide Tegler with a basis for her CEPA claim." Id. at 23-24.

The second element of the prima facie case of Tegler's CEPA claim requires that she performed a "whistle-blowing" activity as described in N.J.S.A. 34:19-3, which states: "An employer shall not take any retaliatory action against an employee

because the employee does any of the following: a. Discloses, or threatens to disclose to a supervisor . . . an activity, policy or practice of the employer . . . that the employee reasonably believes . . . is in violation of a law . . . ; or . . . c. Objects to . . . any activity, policy or practice which the employee reasonably believes . . . is in violation of a law[.]"

Taking the evidence in the light most favorable to Plaintiff, Tegler not only complained to managers at Global Spectrum about Stouffer's conduct, but also to Caiola, the corporate HR manager, in October of 2014. Such complaints would qualify both as disclosures to supervisors (under § 34:19-3a) and objections (under § 34:19-3c). That Plaintiff cannot recall exactly what she stated, or that Caiola's notes do not include the words "racial discrimination," "sexual harassment," or "Law Against Discrimination," does not entitle Defendants to summary judgment on the basis of this argument.

Tegler testified that she passed along complaints of harassment by Stouffer to Rodowicz, Totaro, and McDonald. She testified that those complaints were effectively ignored, as the behavior continued and all that changed was that Tegler was told that her office ought not to serve as "Complaint Central." Taking the evidence in the light most favorable to Tegler, she then told Caiola about Stouffer's behavior, which she could

reasonably have believed violated NJLAD, and the failure of management to adequately address it--a failure that she could also reasonably have believed to constitute a violation of NJLAD. A reasonable finder of fact could conclude that these conversations were the sort of "objection" or "disclosure" contemplated and protected by CEPA. See Crawford v. Metro. Gov't of Nashville and Davidson Cty., 555 U.S. 271, 276 (2009)("'When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication' virtually always 'constitutes the employee's opposition to the activity.'")(alteration in original). Accordingly, Defendants' argument here is not persuasive.

### c. Adverse employment action

The parties do not dispute that Tegler has put forth evidence to support the third element of the prima facie claim, i.e., that she was subjected to an adverse employment action, in that she was terminated on December 5, 2014.

### d. Causal connection

Defendants proceed to argue that no reasonable juror could find the requisite causal nexus between her protected activity (i.e., the complaints to management and/or the meeting with Caiola) and her termination. The Court disagrees.

First, Defendants argue that the temporal proximity between Tegler's latest possible whistle-blowing activity (the conversation with Caiola on October 15, 2014) and her termination on December 5, 2014--a period of approximately seven weeks--is not so unduly suggestive that it, standing alone, can allow a reasonable finder of fact to conclude that a causal nexus existed between the two. [Docket Item 46-2 at 24-25.] See, e.g., Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003)("In cases such as this one where the temporal proximity [i.e., three weeks between complaint and termination,] is not so close as to be unduly suggestive, we have recognized that timing plus other evidence may be an appropriate test" )(internal citations omitted).

The Court notes at the outset of this inquiry that "[i]t is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 178 (3d Cir. 1997).

The Court finds that the evidentiary record supports a genuine dispute of material fact as to when Rodowicz, Totaro, and McDonald learned of Tegler's conversation with Caiola. The record suggests, but does not establish, that the meeting with

Caiola in Philadelphia was when Rodowicz, Totaro, and McDonald
learned of Tegler's complaints about Stouffer to Caiola. See
Daniels, 776 F.3d at 196 (plaintiff "cannot establish that there
was a causal connection without some evidence that the
individuals responsible for the adverse action knew of the
plaintiff's protected conduct at the time they acted"). Given
the possibility that this meeting occurred very close in time to
Tegler's termination, Plaintiff may yet be able to persuade a
reasonable finder of fact that the temporal proximity between
the relevant decisionmaker (i.e., Rodowicz) learning of her
complaint and his decision to terminate her was so short so as
to be unduly suggestive, under Third Circuit precedent. See
Budhun v. Reading Hosp. and Med. Ctr., 765 F.3d 245, 257-58 (3d
Cir. 2014).

Because the Court finds that there is a genuine dispute of
material fact as to this issue, summary judgment on the grounds
that Plaintiff cannot establish an unduly suggestive temporal
proximity between her complaint to Caiola and her termination by
Rodowicz is not appropriate.

Furthermore, the Court notes that the "Third Circuit allows
a plaintiff to 'rely on a broad array of evidence to demonstrate
a causal link between his protected activity and the adverse
action taken against him.'" Gillyard v. Geithner, 81 F. Supp. 3d

437, 443 (E.D.Pa. 2015)(citing <u>Marra v. Phila. Hous. Auth.</u>, 497

F.3d 286, 302 (3d Cir. 2007))(further internal citations

omitted). The "mere passage of time is not legally conclusive

proof against retaliation." <u>Marra</u>, 497 F.3d at 302 (citing

<u>Robinson v. Southeastern Pa. Transp. Auth.</u>, 982 F.2d 892, 894

(3d Cir. 1993)). "Where the time between the protected activity

and adverse action is not so close as to be unusually suggestive

of a causal connection standing alone, courts may look to the

intervening period for demonstrative proof, such as actual

antagonistic conduct or animus against the employee, or other

types of circumstantial evidence, such as inconsistent reasons

given by the employer for terminating the employee or the

employer's treatment of other employees, that give rise to an

inference of causation when considered as a whole." <u>Marra</u>, 497

F.3d at 302 (internal citations omitted).

It is also fair to state, based on this evidentiary record,

that there is a genuine dispute of material fact about when

Rodowicz et al. resolved to terminate Plaintiff; to the extent

that this decision could have been made very close in time to

when he learned of Plaintiff's complaints to Caiola, a

reasonable finder of fact could find such temporal proximity

unduly suggestive, obviating the requirement for additional

evidence of a causal nexus. See <u>Kachmar</u>, 109 F.3d at 177-78

(plaintiff was told her position had been offered to a male in November 1993, which would show that defendant had resolved to discharge her shortly after her latest protected activity in mid-1993, compared to her actual termination date of 1994); Hill v. City of Scranton, 411 F.3d 118, 133 (3d Cir. 2005)(taking into account, when assessing temporal proximity, that pre-termination hearing was originally scheduled three months prior to eventual termination date).

Upon review of the evidentiary record, the Court finds that a reasonable finder of fact could rationally conclude that circumstantial evidence, beyond the seven week gap between October 15 and December 5, 2014, supports a conclusion that Tegler's escalation of her complaints to Caiola played a substantial role (i.e., were causally related) to Rodowicz, Totaro, and McDonald's decision to terminate her.

Plaintiff was never placed on a formal performance improvement plan, despite Rodowicz claiming that she had been placed on a performance improvement plan and then modifying his testimony to clarify that they had discussed her performance, and despite the apparent ability and practice of Global Spectrum to place employees on formal performance improvement plans when warranted (as Stouffer later was). Plaintiff was told repeatedly that she was not to serve as "Complaint Central" and Rodowicz et

al.'s stated concerns with her performance were primarily centered on her not being "positive" enough. Defendants' proffered reason for her termination at the time of the termination was lack of a "good fit." To the extent that Defendants claim Tegler was unaccepting of the Open Door Policy and the preference of Global Spectrum for complaints to go through supervisors, a reasonable finder of fact could find that explanation unworthy of credence inasmuch as Plaintiff has presented evidence that she in fact accepted the Policy, see infra at IV.A.3., or, alternatively, another way of saying that Plaintiff continued to accept and transmit complaints about the (allegedly NJLAD-violative) conduct of Stouffer.

Defendants have not cited other contemporaneous evidence supporting an allegation of poor performance by Plaintiff. Cf. Harley v. Geithner, No. 07-3559, 2010 WL 3906642, *18 (D.N.J. Sept. 29, 2010)(no pattern of antagonism or conclusion based on "facts as a whole" to support retaliatory animus where "there was no dispute but that Plaintiff was tardy reporting to work on these few occasions" where plaintiff claimed supervisors were antagonistic); see also Hatcher v. Family Dollar Store, Inc., No. 08-1444, 2010 WL 1257736, *10-*10 n.13 (Mar. 26, 2010)("The existence of doubts about an employer's stated reasons for a termination can support a finding of causation" as well as a

finding for the employee on the issue of pretext, and "the

thrust of <u>Zelinski[ v. Pennsylvania State Police</u>, 108 Fed. App'x

700, 707 (3d Cir. 2004)] and the precedent it cites is merely

that among the kinds of circumstantial evidence from which

causation can be inferred is the fact that the official reason

given for the termination was pretext, as in the case of

inconsistent reasons" even where a plaintiff points only to one

false reason rather than inconsistent reasons).

Considering all the circumstances alleged and supported by

the evidentiary record, a reasonable finder of fact could

conclude that Plaintiff's complaints, first to management and

then to Caiola, motivated Defendants to terminate her

employment. This is sufficient evidence to allow Plaintiff to

make out the third element, and therefore her prima facie case,

of retaliation under CEPA.

### 3. Legitimate, non-retaliatory reason for discharge & pretext

Finally as to Plaintiff's CEPA claim, Defendants argue that

Plaintiff will not be able to sustain her burden to prove

pretext. Again, the Court disagrees.

"'Once the employee has made a prima facie showing of

retaliation, the burden of going forward shifts to the employer

who must articulate a legitimate, non-retaliatory reason for the

adverse employment decision. If the employer does produce

evidence showing a legitimate, non-retaliatory reason for the

discharge, the burden of production shifts back to the employee

who must show that the employer's proffered explanation is

incredible.' Fleming[ v. Correctional Healthcare Solutions,

Inc., 164 N.J. 90, 100 (2000)]. It is important to note that the

burden of proof remains on the plaintiff throughout this

process." Zaffuto v. Wal-Mart Stores, Inc., 130 Fed. App'x 566,

569 (3d Cir. 2005)(internal alterations omitted).

The plaintiff, "in order to survive summary judgment, must

raise an issue of fact regarding whether the defendant's

proffered explanation is pretextual or whether retaliatory

discrimination was more likely than not a determinative factor

in the decision." McCullough v. City of Atlantic City, 137 F.

Supp. 2d 557, 573 (D.N.J. 2001)(citing Fuentes v. Perskie, 32

F.3d 759, 764 (3d Cir. 1994).

> The employee need not submit direct evidence of
> discrimination [or retaliation], but must only raise a
> genuine issue of fact suggesting pretext by providing
> some evidence establishing a reasonable inference that
> the employer's proffered reason for the decision was
> weak, implausible, inconsistent, incoherent or
> contradictory so as to be unworthy of credence. Bowles
> v. City of Camden, 993 F. Supp. 255, 262 (D.N.J.
> 1998). Summary judgment is improper if the plaintiff
> points to some evidence that raises doubt about the
> employer's proffered explanation for the employment
> decision. Id.

McCullough, 137 F. Supp. 2d at 573. In order "to survive a

motion for summary judgment when the defendant offers a

legitimate reason for its employment action," the plaintiff must "submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that [retaliation] was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994). "The plaintiff cannot simply show that the employer's decision was wrong or mistaken but rather must demonstrate" that a reasonable factfinder could find the proffered legitimate reason to be "unworthy of credence, and hence infer that the employer did not act for the asserted non[-retaliatory] reasons." Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 199 (3d Cir. 2015)(internal citations omitted).

"Plaintiff's ultimate burden of proof is to prove by a preponderance of the evidence that his protected, whistleblowing activity was a determinative or substantial, motivating factor in defendant's decision to terminate his employment--that it made a difference. Plaintiff need not prove that his whistleblowing activity was the only factor in the decision to fire him." Donofry v. Autotote Systems, Inc., 350 N.J. Super. 276, 296 (App. Div. 2001).

The Court will assume without deciding that Defendants'
contemporaneous explanation for Plaintiff's termination (that
she was "not a good fit") as well as the subsequent proffered
explanation--that she failed to improve after being counseled on
the needs to improve her positive energy, follow the chain of
command expressed by the Open Door Policy, and refer non-
pressing departmental issues back to department managers--
constitute legitimate, non-retaliatory reasons for her
termination. If this is so, then Defendants have satisfied their
burden of production under McDonnell Douglas, and the burden
shifts back to Plaintiff to demonstrate evidence from which a
finder of fact could reasonably conclude that the proffered
reasons were pretextual and/or that retaliation was, more likely
than not, a motivating or determinative cause for her
termination.

Here, the Court finds that a reasonable finder of fact
could conclude that Defendants' stated reasons for Plaintiff's
termination were pretextual, and that retaliatory animus played
a determinative or substantial motivating role in the decision
to terminate her employment. Part of the proffered reason for
Plaintiff's termination was that Rodowicz, Totaro, and McDonald
failed to see improvement after counseling Plaintiff to follow
the chain of command in the Open Door Policy and to refer non-

pressing departmental issues back to the departmental manager.
However, Molodovitch testified that Plaintiff informed
Molodovitch of this directive, stating that while at SMG,
employees who felt their managers were not adequately addressing
their concerns within the department would, as a next step,
approach HR

> and then HR would go -- I guess go to the department
> in many cases and see what was going on and try to
> help out the employee. We were told not to do that.
>
> Q: By whom?
>
> A: By the new management team. It came to us through
> Fran and whoever else. I'm not sure exactly who said
> these things because I wasn't directly in the
> meetings. I would just get it that we were told that
> we were not to deal with the employees directly, we
> were to send them immediately back to their
> departments or to Fran and Jim.
>
> Q: You said you weren't in the meeting so did somebody
> tell you about this?
>
> A: Yes.
>
> Q: Who told you?
>
> A: Gayle.
>
> Q: Ms. Tegler told you about what Mr. Rodowicz said?
>
> A: Told me what we were to do going forward as far as
> out directives from management on how to handle our
> role in HR.
>
> Q: And what were the directives that Ms. Tegler
> informed you of?
>
> A: Not to get involved in employee issues, that we
> were no longer to be their point [person], that they

were not to come to use for any help or assistance,
they were to go directly to their department or to
Fran and Jim.

. . .

Q: So then the basis for you understanding of the
directive is your conversations with Ms. Tegler?

A: Mostly. I also heard it from employees.

[Docket Item 46-1 at 123; see also id. at 125.[9]] The Court finds

that this provides an evidentiary basis for a reasonable finder

of fact to conclude that Tegler did not, as claimed, fail to

follow the chain of command directive as Defendants allege, but

rather that she heard the directive and transmitted the change

in policy to Molodovitch, her direct report. Molodovitch

testified that employees nevertheless came to HR "because they

knew [Tegler and Molodovitch] and that's why they came to [them]

with their issues because" intradepartmental problems were not

being addressed. Id. at 125. However, a reasonable finder of

fact could conclude, based on Molodovitch's testimony, that

Plaintiff abided by Defendants' directive, followed the Open

---

[9] Molodovitch testified: "[W]e were told that we were not to
listen to the employees and that any employee complaints were to
go directly to them. And when the employee complaints would go
directly to them, the employees would come back and tell us.
When they would come back to us saying we're not getting -- that
nothing is being done, we would say, 'I'm sorry, you have to go
to them because that's the protocol. It has to go through them.'
They would say that nothing was being done, they were being
ignored."

Door Policy and referred those employees "directly to their department or to Fran and Jim," and instructed Molodovitch to do the same. Given that testimony, a reasonable finder of fact could say that Defendants' stated reason for the termination-- that Plaintiff failed to improve with regard to following the chain of command and the Open Door Policy--is not just "mistaken" or "wrong" (which would be relevant to the question of "whether the employer is wise, shrewd, prudent, or competent" but not to the necessary question of "whether [retaliatory] animus motivated the employer") but rather is so weak or implausible that it is unworthy of credence, allowing for an inference that the actual reason was retaliatory. See Fuentes, 32 F.3d at 765.

Relatedly, the record suggests that Plaintiff was never placed on a formal performance improvement plan, despite Rodowicz claiming that she had been placed on a performance improvement plan and then modifying his testimony to clarify that they had discussed her performance, and despite the apparent ability and practice of Global Spectrum to place employees on formal performance improvement plans when warranted (as Stouffer later was).

Plaintiff was told repeatedly that she was not to serve as "Complaint Central" and Rodowicz et al.'s stated concerns with

her performance were primarily centered on her not being "positive" enough; Defendants' proffered reason for her termination at the time of the termination was lack of a "good fit." However, Molodovitch testified that she would not characterize Plaintiff as a negative person, that Plaintiff never complained about any managers or non-managers at Global Spectrum, and that she did not recall hearing complaints about Plaintiff at Global Spectrum (aside from complaints by Stouffer). [Docket Items 46-1 at 128; 49-2 at 133, 137.]

To the extent that Defendants claim Tegler was unaccepting of the Open Door Policy and the preference of Global Spectrum for complaints to go through supervisors, a reasonable finder of fact could find that explanation unworthy of credence inasmuch as Plaintiff has presented evidence that she in fact accepted the Policy, see supra. Alternatively, a reasonable finder of fact could conclude that the stated reason of Tegler's alleged failure to improve in abiding by the Open Door Policy constitutes another way of saying that Plaintiff continued to accept and transmit complaints about the (allegedly NJLAD-violative) conduct of Stouffer. The Court understands that Defendants argue and arguably believed at the time that those complaints were not complaints of harassment or discrimination; however, the Court has found that Tegler could reasonably have

believed them to be so.

As to the stated reasons that Plaintiff lacked a sufficiently positive attitude and did not accept Global Spectrum's management and decisions, the Court finds that the evidence could reasonably support a finding of pretext on this issue as well. Plaintiff repeatedly testified that, while she was concerned by management's decision about the proper role of HR and felt that they were not adequately responding to her complaints about Stouffer, she sought to minimize what she perceived to be Global Spectrum's exposure to liability and to be "a business partner" to Global Spectrum. [Docket Item 49-2 at 31.] Indeed, the very first line of Caiola's notes of October 15 reflect Plaintiff making the same statement to Caiola, even as she raised her concerns about Stouffer: "Wants to help & be Fran, Karen's & Jim's HR partner." [Docket Item 49-4 at 203.]

Under these circumstances, then, the Court finds that sufficient evidence exists in the record to allow a reasonable finder of fact to conclude that each of Defendants' stated non-retaliatory reasons for Plaintiff's discharge are unworthy of credence and thereby infer that retaliatory animus actually motivated the decision to discharge her. She has identified reasons to disbelieve the proffered grounds, and summary judgment is inappropriate. Cf. Aman v. Cort Furniture Renal

<u>Corp.</u>, 85 F.3d 1074, 1086 (3d Cir. 1996)(plaintiff purportedly released for disloyalty after not attending deposition as employer required nevertheless "provided evidence which casts doubt upon [defendant's] reliance upon the deposition incident as the sole basis for her firing" where plaintiff testified that she was willing to be deposed after she had the opportunity to consult with an attorney; "reasonable jury could conclude" that plaintiff "did not refuse[,]" "that there was no disloyalty and that [defendant's] proffered reason is a pretext to mask a retaliatory motive") and <u>Hajra v. Wawa, Inc.</u>, No. 15-7513, 2018 WL 565574, *8-*9 (D.N.J. Jan. 26, 2018)(plaintiff did not identify a genuine dispute of material fact as to pretext where the court "has scoured the record and has found no evidence that calls into doubt Wawa's articulated legitimate reason for terminating Plaintiff: that Plaintiff engaged in fraudulent 'drive-offs[]'" and plaintiff's attempts to show that he did not do so constituted "obfuscation of the record" that was "more about pretense than pretext").

Finally, the Court notes that the Third Circuit has condoned, when a reviewing court considers the totality of the evidence, an approach wherein a "fact-finder would be entitled to consider all of the evidence of a hostile environment in order to determine the reason for" a plaintiff's termination, as

"'[e]vidence of prior acts of discrimination is relevant to an employer's motive even where this evidence is not extensive enough to establish discriminatory animus itself'": "As we have recognized, 'an atmosphere of condoned [racial] harassment in the workplace increases the likelihood of retaliation for complaints in individual cases.'" Aman, 85 F.3d at 1086 (citing Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1104 (8th Cir. 1988) and Glass v. Philadelphia Elec. Co., 34 F.3d 188, 195 (3d Cir. 1994)(internal citations omitted)).

Given the totality of the evidence, the Court finds that a reasonable finder of fact could conclude that Defendants possessed a retaliatory animus when terminating Plaintiff, and that their proffered reasons for her termination (to the extent that they are considered legitimate and non-retaliatory) are unworthy of credence. Plaintiff has satisfied her burden of producing evidence from which a reasonable finder of fact could conclude that Defendants' reasons were pretextual and that retaliation actually animated the decision to fire Plaintiff. Accordingly, Defendants' motion for summary judgment as to Plaintiff's CEPA claim will be denied.

**B. Age Discrimination (NJLAD) (Count II)**

Defendants argue that Plaintiff has failed to come forward

with evidence of her claim for age discrimination in violation of NJLAD. The Court finds that, assuming arguendo that Plaintiff has made out her prima facie case (as Defendants concede for the purpose of this motion [Docket Item 46-2 at 27 n.1]), Plaintiff has adduced evidence to allow a reasonable finder of fact to conclude that the actual decisionmakers beared Plaintiff animus based on age.

Age discrimination in employment violates NJLAD. N.J.S.A. 10:5-12(a). New Jersey courts look to federal law to evaluate NJLAD claims. Battaglia, 214 N.J. at 546. To establish a prima facie case of termination based on age, Plaintiff must establish that (1) she was a member of a protected class; (2) she was qualified for the position from which she was discharged, or, stated differently, was performing in the position from which she was terminated; (3) she was nevertheless terminated from that position; and (4) she was replaced by someone younger. Healy v. New York Life Ins. Co., 860 F.2d 1209, 1214 (3d Cir. 1988); Zive v. Stanley Roberts, Inc., 182 N.J. 436, 457-58 (2005).

Plaintiff alleges that she was sixty-two years old when she was terminated from her position as HR manager, despite performing those duties in a diligent manner, and was replaced by a woman sixteen years younger than her. If true, this would

satisfy the prima facie elements of age discrimination under NJLAD.

"Establishment of the prima facie case gives rise to a presumption that the employer unlawfully discriminated against the [plaintiff]. The burden of going forward then shifts to the employer to rebut the presumption of undue discrimination by articulating some legitimate, nondiscriminatory reason for the" adverse action. Grigoletti v. Ortho Pharm. Corp., 118 N.J. 89, 98 (1990)(citation omitted). "The plaintiff then has the opportunity to prove by a preponderance of the evidence that the legitimate nondiscriminatory reason articulated by the defendant was not the true reason for the employment decision but was merely a pretext for discrimination. In such cases the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff[.]" Id.

Defendant has asserted legitimate non-retaliatory reasons for Plaintiff's termination. See supra, IV.A.3. The Court found that the evidentiary record could reasonably support a finding that those reasons were pretextual and that the actual motivating factor was retaliatory animus. Id. In contrast, here, the Court finds that the evidentiary record could not reasonably support a finding that those reasons were pretextual and masked

an actual motivating factor of Plaintiff's age. In the analogous setting of an ADEA case, the Supreme Court noted: "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. . . . In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000), citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 517 (1993)(internal quotation omitted).

"In cases alleging age discrimination under the NJLAD, an employee must show that the prohibited consideration, age, played a role in the decisionmaking process and that it had a determinative influence on the outcome of that process." Buchholz v. Victor Printing, Inc., 877 F. Supp. 2d 180, 185 (D.N.J. 2012)(internal citations omitted). See also Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)("Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome").

Plaintiff's allegations that age played a role in the

decision to terminate her employment center on the ages of Global Spectrum's management team: "The age make-up of the management team was all under sixty years of age with most of the management employees being in the age group between thirty to forty years of age." [Docket Item 49 at 25.] She also alleges that, after she was fired, the only remaining employee over the age of sixty was Molodovitch, who was told that she could either resign or work part-time. When Molodovitch resigned rather than opt for a part-time schedule, a much younger woman was hired to replace her, and the position was (allegedly) made full-time again. Id. [See also Docket Item 49-2 at 127-28.] Finally, Plaintiff states that "[t]he negative age-based comments to Tegler by Stouffer which were countenanced by Rodowicz, Totaro, and McDonald also reflect an animus towards the inclusion of an older person in that management team." [Docket Item 49 at 25-26.]

Plaintiff, as the party opposing summary judgment, receives the benefit of the favorable inference that Defendants' stated nondiscriminatory reason is pretextual. The jury could thus draw an inference that the Defendants' reasons for termination are not only incorrect but knowingly false, in an attempt to conceal a discriminatory motive in the termination. When material facts are in dispute as to the asserted nondiscriminatory reason for

the adverse employment action, and where other evidence suggests, if accepted by the jury, that the true motivating factor was Plaintiff's age, then the case must go forward to the jury. Whether Plaintiff can demonstrate that her age played a determinative role in Defendants' termination decision will depend on the jury's evaluation of credibility and weight of the evidence outlined above. This evidence includes the plausibility of Defendants' proffered reasons for termination, the strength to be assigned to Plaintiff's prima facie case, the relatively youthfulness of the decisionmakers, and the nearly simultaneous, allegedly forced retirement of the only other employee (Molodovitch) in Plaintiff's over-60 age cohort.[10] In Hazen Paper, the Supreme Court noted that the evidence reflected "two isolated comments by the Hazens" as well as the facts that the employee "was asked to sign a confidentiality agreement, even though no other employee had been required to do so, and his replacement was a younger man who was given a less onerous agreement[,]" and stated: "In the ordinary [age discrimination]

---

[10] The Court does not discern evidence in the record to allow a reasonable finder of fact to say that Rodowicz, Totaro, or McDonald "countenanced" Stouffer's arguably-age-related comments, when Plaintiff does not point to evidence showing that they even knew of such comments, and the evidence is uncontroverted that Stouffer did not play a decisionmaking role in Plaintiff's termination. See Aguas v. State, 220 N.J. 494, 528 (2015).

case, indirect evidence of this kind may well suffice to support liability if the plaintiff also shows that the employer's explanation for its decision . . . is unworthy of credence." 507 U.S. at 613 (internal citations omitted). The Court then stated: "But inferring age-motivation from the implausibility of the employer's explanation may be problematic in cases where other unsavory motives . . . were present." Id.

The Court is mindful that simply casting doubt on the proffered reason, so as to establish pretext, is not enough: "We must, as an essential final step, determine whether [the employee] presented sufficient evidence that his age motivated [the employer's] employment decision. . . . [T]he factfinder's rejection of the employer's legitimate, nondiscriminatory reason for its action does not compel judgment for the plaintiff. The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct. In other words, it is not enough to dis-believe the employer; the factfinder must believe the plaintiff's explanation of intentional [age] discrimination." Reeves, 530 U.S. at 146 (internal citations and omissions omitted; emphasis in original).

*[Judge, I'm having second thoughts about granting SJ on the age discrimination claim, mostly because of the implication in Reeves that prima facie + pretext is usually plenty to allow for a jury to find liability. I'd welcome your thoughts on this.]*

For these reasons, the Court finds Plaintiff has proffered evidence creating genuine disputes of material fact to support her claim of age discrimination under NJLAD, and Defendant's motion will be denied as to Count II.

### C. FMLA retaliation (Count III)

Defendants argue that they are entitled to summary judgment as to Count III, FMLA retaliation. [Docket Item 46-2 at 29-30.] Plaintiff has, effectively, conceded this argument: "Plaintiff presents no argument in response to defendant's motion to dismiss the claims asserted under the FMLA." [Docket Item 49 at 2 n.1.] The Court agrees that Plaintiff has failed to adduce evidence from which a reasonable finder of fact could conclude that Plaintiff was retaliated against by Defendants in violation of the FMLA, and will grant summary judgment to Defendants on Count III accordingly.

### IV. CONCLUSION

For the foregoing reasons, the Court will deny Defendants'

motion as to Count I (CEPA) of Plaintiff's Complaint, deny

Defendants' motion as to Count II (NJLAD age discrimination),

and grant Defendants' motion as to Count III (FMLA retaliation).

The accompanying Order will be entered.


**February 13, 2018**            **s/ Jerome B. Simandle**
Date                             JEROME B. SIMANDLE
                                 U.S. District Judge